# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| TUBONIMI BOB-MAUNUEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | **No. 12 C 750** |
| v. | ) | |
| | ) | |
| | ) | *Chief Judge Ruben Castillo* |
| CHIPOTLE MEXICAN GRILL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Tubonimi Bob-Manuel brings this action against Chipotle Mexican Grill, Inc., alleging employment discrimination on the basis of race and national origin and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and 42 U.S.C. § 1981 ("Section 1981"); discrimination on the basis of age and retaliation in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (the "ADEA"); discrimination on the basis of disability and retaliation in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (the "ADA"); and retaliatory discharge in violation of Illinois state law. Presently before the Court is Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, the Court grants Defendant's motion in part and denies it in part.

## RELEVANT FACTS[1]

Plaintiff is a fifty-five-year-old black, Nigerian-born, United States citizen. (Pl.'s Rule 56.1 Resp. ¶¶ 42-44.) Defendant is a chain of "fast casual" restaurants that specializes in

---

[1] The Court takes the facts from the parties' statements of material facts. (R. 83, Def.'s Local Rule 56.1(a)(3) Statement of Material Facts ("Def.'s Facts"); R. 96, Pl.'s Response to Def.'s Facts ("Pl.'s Rule 56.1 Resp."); R. 97, Pl.'s Local Rule 56.1(b)(3)(C) Statement of Material Facts ("Pl.'s Facts"); and R. 103, Def.'s Response to Pl.'s Facts ("Def.'s Rule 56.1 Resp.").)

Mexican fare. (*Id.* ¶ 1.) Defendant operates a restaurant located at 1128 Lake Street in Oak Park, Illinois (the "Oak Park Restaurant"), where Plaintiff worked from November 16, 2008, until his termination on March 11, 2011. (*Id.* ¶¶ 1, 10, 41.)

Each of Defendant's restaurants is operated by a set of crew members who are responsible for preparing and cooking food, assembling customer orders, cleaning and maintaining the restaurant, serving customers, and other similar tasks. (*Id.* ¶ 2.) All crew members are at-will employees. (*Id.*) Crew members work in three primary work areas: Grill, Prep, and Line. (*Id.* ¶ 9.) Grill and Prep are stations in the back of the restaurant, and crew members at these stations are required to maintain proper food handling, safety, and sanitation standards while preparing food; follow recipes; exhibit a cheerful and helpful manner; display a positive and enthusiastic approach to all assignments; and develop positive working relationships with all restaurant personnel. (*Id.* ¶ 8.) The Line involves all the positions in the front of the restaurant, which are divided into the tortilla, salsa, expeditor, and cashier stations. (*Id.* ¶ 9.) Crew members are assisted and managed by four levels of management (listed in ascending order of responsibility): Kitchen Manager, Service Manager, Apprentice Manager, and General Manager. (*Id.* ¶ 3.) The General Manager is responsible for making all employment and operational decisions in the restaurant, including deciding who to hire and fire, deciding who to promote and train, and scheduling employees. (*Id.* ¶ 4.) The General Manager is supervised by an Area Manager, whose duties include overseeing a number of restaurants and helping those restaurants reach their goals. (*Id.* ¶ 3.)

## I.    Plaintiff's First Four Months of Employment

General Manager Robert Ruggiero, a Caucasian male, and Apprentice Manager Oscar O'Campo, a Hispanic male, interviewed and hired Plaintiff on November 16, 2008, as a crew

member. (*Id.* ¶ 10.) Plaintiff alleges that he was specifically hired as a general manager trainee on a fast-track to management. (*Id.*; Def.'s Rule 56.1 Resp. ¶ 26.) Joe Kersjes, a twenty-seven-year-old Caucasian male, was hired on November 22, 2008, as a Service Manager. (Pl.'s Rule 56.1 Resp. ¶ 46.) Both Plaintiff and Kersjes initially trained together with Ruggiero, and they worked frequently together in the back of the restaurant. (Def.'s Rule 56.1 Resp. ¶ 27.) Within a few weeks, however, Ruggiero discontinued Plaintiff's training while continuing to train Kersjes. (Pl.'s Rule 56.1 Resp. ¶ 45.) Plaintiff remained almost exclusively in the back of the restaurant, frequently washing dishes, while Kersjes rotated to other stations. (Def.'s Rule 56.1 Resp. ¶ 28.) Kersjes was promoted to Apprentice Manager at the Elmhurst, Illinois Restaurant on April 27, 2009. (*Id.* ¶ 29.) Plaintiff alleges that Ruggiero stopped training him because of his race, national origin, and age. (Pl.'s Rule 56.1 Resp. ¶ 45.) Plaintiff admits, however, that he never heard Ruggiero make any comments regarding Plaintiff's race, national origin, or age. (*Id.* ¶ 47.) Plaintiff also alleges that O'Campo treated him differently based on his race, national origin, and age by making him wash dishes and take out the garbage by himself, by keeping him in the food preparation area, and by refusing to cross-train him. (*Id.* ¶ 48.) Plaintiff admits, however, that washing dishes, taking out garbage, and working in the food preparation area are all responsibilities of a Prep employee. (*Id.*) He also admits that he never heard O'Campo make any comments about his race, national origin, or age. (*Id.* ¶ 49.)

## II. Plaintiff's Performance Issues

Ruggiero was Plaintiff's General Manager for the first four and a half months of Plaintiff's employment. (*Id.* ¶ 11.) After Ruggiero left, Jeanine Cruz Chavez, a Caucasian female, became the General Manager of the Oak Park Restaurant and supervised Plaintiff until October 17, 2010. (*Id.* ¶ 15.) Area Manager Vicky Kubicki, a Caucasian female, was Chavez's

3

supervisor during Plaintiff's employment. (*Id.* ¶ 16.) On June 1, 2009, Chavez recorded in Plaintiff's Development Journal that he needed to work on perfecting his procedure because he made mistakes that would not happen if he took his time, and that he needed to work on completing all Prep tasks by 6:00 p.m. and getting out by 11:00 p.m. (*Id.* ¶ 20.) On June 15, 2009, Plaintiff allegedly received his first written warning (a "Performance Discussion"), stating that on June 13th, he made a batch of guacamole but did not cover it with two lawyers of plastic as he was trained to do; as a result, the guacamole had to be disposed of. (*Id.* ¶ 21.) Plaintiff denies that the guacamole incident occurred and he denies receiving the Performance Discussion. (*Id.*) In fact, Plaintiff denies receiving any of the five Performance Discussions that were in his personnel file. (Def.'s Rule 56.1 Resp. ¶ 15.) Performance Discussions are supposed to be given to employees in a face-to-face meeting and the manager is supposed to confirm receipt, yet none of Plaintiff's Performance Discussions were signed by either Plaintiff or a manager. (*Id.* ¶¶ 14-15.) Michael Triola, the Human Resources Director for the Central Region, admitted that Plaintiff may have never received the Performance Discussions in his file. (*Id.* ¶ 15.)

In 2009, Plaintiff failed to report to work for a scheduled shift on nine occasions. (Pl.'s Rule 56.1 Resp. ¶ 24.) Plaintiff alleges that the schedules posted were not always the final schedule and that Chavez scheduled him to work on days he had requested off due to doctors' appointments. (*Id.*) Chavez also testified that sometimes the schedules changed after they were made. (*Id.*) An undated, unsigned performance review in Plaintiff's file rated Plaintiff's performance in the categories of food, equipment, and customer service as "needs improvement," which is the lowest possible rating. (*Id.* ¶ 27.)

In January 2010, Chavez told Julia Kim, Human Resource Generalist, that Plaintiff was not meeting his job expectations and was a low performer. (*Id.* ¶ 25.) After reviewing Plaintiff's

Development Journal, Performance Discussions, and performance reviews, Kim advised Chavez to have an honest conversation with Plaintiff about expectations on a weekly basis, and then later, on a daily basis. (*Id.* ¶ 26.) Erica Arrington, an Apprentice Manager, noted Plaintiff's performance issues in the Oak Park Restaurant's Dear Diary[2] on several occasions in early 2010: on February 13th she noted that Plaintiff struggled to keep up with Prep and dishes; on March 4th she noted that Plaintiff did not complete Prep and started marinating a steak at 10:50 p.m. even though he was told not to; on March 25th she noted that Plaintiff needed help closing Prep, did not take any garbage out until closing, and had trouble keeping pace with dishes, and that she found an object in steak he marinated. (*Id.* ¶ 28.)

In Plaintiff's second performance review, dated April 2010, he received a "needs improvement" rating in the categories of food, equipment, and customer service. (*Id.* ¶ 30.) Triola reviewed a draft of this review, which Chavez had prepared, and suggested changing whatever appeared "inconsistent" or could be seen as "picking" on Plaintiff. (Def.'s Rule 56.1 Resp. ¶¶ 20-21.) For example, with regard to the food category, Triola said he "would like to see specific examples that we can back up with documentation." (*Id.* ¶ 21.) The version of the evaluation Plaintiff received contained many more details about Plaintiff's performance problems than the version Chavez originally drafted. (*Id.* ¶ 22.) For instance, the evaluation recounted one incident where Plaintiff had allegedly lost two cases of chicken due to improper rotating in February 2010. (*Id.* ¶ 23.) Plaintiff and Arrington testified that the cases of chicken had gone bad, and when Arrington called Chavez to inform her of this, Chavez told Arrington to have Plaintiff marinate the chicken anyway. (*Id.*) But Arrington and Plaintiff agreed that it would be unsafe to prepare the chicken, so they threw it away. (*Id.*) Chavez denied that she

---

[2] A restaurant's "Dear Diary" is a book that Defendant's managers use to communicate with one another about anything that was going on in the restaurant. (Def.'s Rule 56.1 Resp. ¶ 49.)

instructed Arrington and Plaintiff to marinate the chicken. (*Id.*) Kubicki testified that she and Chavez discussed the review with Plaintiff, but Plaintiff denies having participated in such a discussion. (*Id.*) In October 2010, Plaintiff received his third performance review, in which he received an overall rating of "meets expectations," but continued to be rated as "needs improvement" in the food category. (Pl.'s Rule 56.1 Resp. ¶ 32.)

On November 8, 2010, Panithan "Sai" Thanawutthikorn, an Asian male, became General Manager of the Oak Park Restaurant. (*Id.* ¶ 35.) On November 19, 2010, Plaintiff received an evaluation of "meets expectations," and following this evaluation, he received his first and only pay increase. (Def.'s Rule 56.1 Resp. ¶ 37.) On December 23, 2010, Plaintiff received a Performance Discussion for his tardiness, which stated: "Bob was 15 mins late and did not call. 12/21/10 Bob was 15 mins late but did not call . . . at 8:15 to let us know that he will be in at 8:30." (Pl.'s Rule 56.1 Resp. ¶ 36.) Plaintiff was warned: "Please do not be late again. This will be the last write up." (*Id.*) Plaintiff denies that he was late those days, and he denies receiving the Performance Discussion. (*Id.*) Plaintiff's time sheet indicates that on December 21, 2010, he clocked in at 8:14 a.m. (*Id.*) Defendant alleges that Plaintiff reported to work six or more minutes late 32 times between June 8, 2009 and December 23, 2010. (*Id.* ¶ 37.) Plaintiff denies these allegations and states that the schedules posted were not always the final schedule. (*Id.*) Plaintiff's time sheets also indicate that on eleven occasions when Plaintiff allegedly committed a violation of Defendant's policies or procedures, he was not at work. (Def.'s Rule 56.1 Resp. ¶ 13.)

Kubicki visited the Oak Park Restaurant between once a week and once a month on average and observed Plaintiff on multiple occasions. (Pl.'s Rule 56.1 Resp. ¶ 17.) Kubicki observed issues with Plaintiff's performance: he failed to clean his dish area, washed dishes with

dirty water, and repeatedly violated food safety standards when he placed chicken and carnitas on the same table. (*Id.*) Kubicki also noted Plaintiff's repeated failure to complete tasks in a timely manner. (*Id.*) Kubicki described Plaintiff's performance as "never satisfactory." (*Id.* ¶ 18.) She testified that he would argue with anyone who gave him any constructive feedback, including herself. (*Id.*) She also stated that crew members and managers were afraid of him because of his explosive and condescending demeanor. (*Id.*)

Plaintiff denies Kubicki's allegation that his performance was never satisfactory. (*Id.*) Kim testified that Defendant considered Plaintiff's performance to be satisfactory in his November 2010 review. (*Id.*) Arrington testified that Plaintiff was the "Ace in his Place" for Prep, meaning he was assigned to that station during peak hours because he was the strongest employee in that position. (*Id.*) Plaintiff also denies Kubicki's allegation that Plaintiff would argue with anyone who gave him constructive feedback and that crew members and managers were afraid of him. (*Id.*) Arrington testified that Plaintiff never frightened her and that she enjoyed working with him, as he was always professional and polite. (*Id.*) Arrington also testified that Plaintiff was open to feedback if it was constructive, but that Kubicki's and Chavez's feedback was not constructive. (*Id.* ¶ 19.) Arrington and Arlene Guerrero, a Service Manager, testified that Plaintiff was a team player, competent employee, and a hard worker. (Def.'s Rule 56.1 Resp. ¶ 36.) Plaintiff always offered his assistance to anyone who needed it when Arrington was a manager. (*Id.*) He went "above and beyond," and was a mentor to Arrington and Guerrero. (*Id.*)

## III.    Events Surrounding Plaintiff's Termination

Thanawutthikorn took an eight-week leave of absence in early March 2011, and Apprentice Manager Veronica Garcia, a Hispanic female, became the acting General Manager

for the Oak Park Restaurant. (Pl.'s Rule 56.1 Resp. ¶ 38.) Garcia reported to Kubicki that she had three conversations with Plaintiff because he refused to wear gloves and was eating food while preparing food, which were both violations of Defendant's and Illinois's food safety policies and grounds for termination under Defendant's policies. (*Id.*) Plaintiff denies that he ate while preparing food. (*Id.*) On March 4, 2011, the Oak Park Restaurant management team called and emailed Kubicki with concerns about Plaintiff's attitude and food safety violations. (*Id.* ¶ 39.) The email stated that Plaintiff was not respectful in the workplace; that he left a soiled towel on the prep table when the health inspector was inspecting the restaurant on February 28, 2011; that Thanawutthikorn asked Plaintiff to not eat while prepping on March 1, 2011; that Garcia saw Plaintiff eating bell peppers while cutting them, asked him to not eat while prepping food, and Plaintiff asked her "what am I eating?" on March 4, 2011; that Garcia found a soiled towel on the prep table again on March 4, 2011; and that when Garcia asked Plaintiff to check the dining room and dishes on March 4th, Plaintiff became angry and began throwing dishes and using profanity, including "fuck this shit." (*Id.*)

Plaintiff denies that these incidents occurred, and his time sheet indicates that he was not at work on March 4, 2011. (*Id.*) Guerrero testified that she never saw Plaintiff leave a soiled towel in the prep area, but that it was done all the time by other employees. (Def.'s Rule 56.1 Resp. ¶ 56.) She stated that other employees did not follow procedures all the time, but no one else's errors were documented as frequently as Plaintiff's. (*Id.*) Guerrero believed she may have written up Plaintiff for an incident where Plaintiff was eating a bell pepper while prepping food, but she did not remember if she saw him eating the bell pepper. (*Id.* ¶ 57.) She testified that she would not have documented the incident but for Kubicki's instruction to document everything Plaintiff did. (*Id.*) Arrington testified that it was frequent for employees at the Oak Park

8

Restaurant to use profanity and that Plaintiff swore less often than other employees. (*Id.* ¶ 58.) Neither Arrington nor Guerrero were aware of any employees being disciplined for using profanity. (*Id.*) Although the memorandum that accompanied Plaintiff's termination stated that Guerrero heard Plaintiff say "God damn it," she testified that she never heard Plaintiff use profanity or saw him throw dishes or be insubordinate. (*Id.*)

Kubicki forwarded the March 4, 2011 email to Triola, seeking advice on how to handle Plaintiff's behavior. (Pl.'s Rule 56.1 Resp. ¶ 40.) Kubicki testified that Triola instructed her to initiate Plaintiff's termination and sent her a termination memorandum that summarized Plaintiff's behavior as described in the March 4th email. (*Id.*; Def.'s Rule 56.1 Resp. ¶ 59.) Kubicki agreed that Plaintiff's behavior warranted termination and carried out Plaintiff's termination on March 11, 2011. (Pl.'s Rule 56.1 Resp. ¶¶ 40-41.) Triola admitted that he was involved in drafting Plaintiff's termination memorandum, but he testified that Kubicki made the decision to terminate Plaintiff and that he did not provide any advice as to whether Plaintiff should be terminated. (Def.'s Rule 56.1 Resp. ¶ 60.) Kubicki testified that Plaintiff was terminated based on the incidents described in the termination memorandum and on his overall performance. (*Id.* ¶ 61.) Triola testified that Plaintiff was terminated for insubordination only, not for performance reasons. (*Id.*) The position statement Defendant submitted to the Equal Employment Opportunity Commission ("EEOC") stated that Plaintiff was terminated for unexcused absences, poor performance, inability to meet Defendant's reasonable expectations, violations of Defendant's Food Safety Policies and Procedures, and insubordination. (*Id.*)

## IV. Plaintiff's Allegations of Race, National Origin, and Age Discrimination

Plaintiff alleges that Chavez treated him differently based on his race, national origin, age, and disability by keeping him in the kitchen/preparation area, making him wash dishes,

making him take out the garbage alone, failing to train or promote him, excessively micromanaging him, making derogatory comments, humiliating him, cutting his hours after he requested an accommodation based on his disability, and denying him a raise. (Pl.'s Rule 56.1 Resp. ¶ 50.) Chavez micromanaged Plaintiff by standing over him and watching him complete tasks that he knew how to do, like marinating meat. (Def.'s Rule 56.1 Resp. ¶ 5.) She also examined the avocado peels in the garbage to check to see if Plaintiff had wasted any avocado, and she checked the size of the lettuce that Plaintiff had cut. (*Id.*) Plaintiff alleges that Chavez called him "Bobo," which he did not like. (Pl.'s Rule 56.1 Resp. ¶ 51.) Plaintiff also alleges that Chavez made fun of his accent. (Def.'s Rule 56.1 Resp. ¶ 2.) On one occasion, after Chavez terminated Chase Wright, an African-American employee, she told Plaintiff, "Bob you're a survivor. I've been wanting to fire you." (*Id.* ¶ 3.) Arrington, who was present for this comment, heard Chavez make a substantially similar statement. (*Id.*) On another occasion, Chavez asked Plaintiff whether he was getting ready to retire. (*Id.* ¶ 4.) Arrington stated that Chavez showed a preference for younger workers because she believed they could work faster. (*Id.*)

Arrington testified that Chavez told Lloyd Jones, a newly-hired African-American employee, "I hope you don't get mad, but I like to make black jokes." (*Id.* ¶ 9.) Soon after, with Arrington's assistance, Jones transferred to Defendant's Elmhurst Restaurant. (*Id.*) Chavez made comments about Arrington's half African-American daughter, such as "why would you have your baby with an afro," and "what is wrong with her hair?" (*Id.* ¶ 10.) Plaintiff alleges that racism was rampant at the Oak Park Restaurant, and that it was because of this that Chavez held a mandatory meeting where she stated that discrimination against African-Americans would not be tolerated. (Pl.'s Rule 56.1 Resp. ¶ 51.) Chavez was terminated after two employees

complained that she made derogatory comments about African-Americans, but Defendant denies that those complaints were the basis for her termination. (Def.'s Rule 56.1 Resp. ¶ 12.)

To be promoted to Kitchen Manager, a crew member must be proficient and cross-trained on all areas in the back of the restaurant (*i.e.* Grill and Prep) and know and follow all procedures. (Pl.'s Rule 56.1 Resp. ¶ 33.) Defendant alleges that Plaintiff was never promoted to Kitchen Manager because he was not cross-trained on all areas of the kitchen. (*Id.* ¶ 34.) Plaintiff alleges that he was denied training that had been promised to him at the time of his hire. (*Id.*) Arrington witnessed the training Plaintiff received both at the beginning of his employment and after his initial management training was stopped. (Def.'s Rule 56.1 Resp. ¶ 30.) Arrington testified that Plaintiff was trained on the line sporadically and when there was a line out the door, which made it difficult for him to be successful. (*Id.*) Chavez told Arrington that Plaintiff was not going to be promoted. (*Id.* ¶ 1.) Plaintiff alleges that Arrington was promoted over him. (Pl.'s Rule 56.1 Resp. ¶ 52.) Arrington was promoted to Kitchen Manager on September 14, 2009, after receiving a performance review on April 26, 2009, indicating that she met expectations in every category; she was promoted to Service Manager on November 9, 2009. (*Id.*; Def.'s Rule 56.1 Resp. ¶ 6.)

Plaintiff also alleges that Ryan Haydon was promoted over him. (Pl.'s Rule 56.1 Resp. ¶ 53.) Haydon, a thirty-year-old Caucasian male, was hired on November 3, 2009, and was promoted to Kitchen Manager on May 10, 2010, after receiving a performance review of "above expectations" in all categories. (*Id.*) David Resendiz, a twenty-four-year-old Hispanic male, was hired on May 20, 2009, as a crew member; although he was never promoted, he was made a Kitchen Manager-in-training, a position that precedes a promotion to Kitchen Manager. (*Id.* ¶ 55; Def.'s Rule 56.1 Resp. ¶ 32.) Arrington observed the training that Haydon and Resendiz

11

received and testified that she, Haydon, and Resendiz were trained on virtually all the stations and received more training and resources than Plaintiff. (Def.'s Rule 56.1 Resp. ¶ 31.) Arrington testified that she believes that Plaintiff would have been capable of being a Service Manager if he had been given the same tools, resources, and support as other employees. (*Id.*)

Plaintiff also alleges that Kristina Rodriguez was hired after him and was promoted over him. (Pl.'s Rule 56.1 Resp. ¶ 54.) Rodriguez, a twenty-seven-year-old Hispanic female, was hired on July 11, 2006, at a Chipotle in Kansas, was promoted to Kitchen Manager on September 28, 2009, in Kansas, and then was transferred to the Oak Park Restaurant on October 5, 2009. (*Id.*) Plaintiff further alleges that Maria Guerrero was promoted over him. (*Id.* ¶ 56.) Maria Guerrero, a twenty-five-year-old Hispanic female, was hired on November 2, 2007, at the River North Restaurant and was promoted to Kitchen Manager on September 24, 2012, more than a year after Plaintiff's termination. (*Id.*)

During the time Plaintiff was employed at the Oak Park Restaurant, seven Hispanics, five Caucasians, and five African-Americans were terminated for unacceptable work performance; two Hispanics were terminated for insubordination; and one Caucasian and one multi-racial individual were terminated for violating company rules. (*Id.* ¶ 57.)

## V.    Plaintiff's Health Issues

Plaintiff alleges that he suffers from a congenital heart disorder, retinopathy, kidney disease, hypertension, and an inguinal hernia. (*Id.* ¶ 58.) Plaintiff alleges that his congenital heart disorder made him tired and made it impracticable for him to function as a normal, healthy person. (*Id.* ¶ 59.) Defendant alleges that Plaintiff's heart is normal and not diseased because computed tomography scans of his chest revealed no acute cardiopulmonary disease and echocardiograms revealed normal systolic function and no regional wall abnormalities. (*Id.* ¶

60.)  On March 27, 2013, Plaintiff was examined by Dr. Matilda Malm at John H. Stroger Jr. Hospital ("Stroger Hospital") who indicated that his chest pains were unlikely cardiac-related; he was treated for gastroesophageal reflux disease. (*Id.*; R. 89-8, Ex. III, Pl.'s Stroger Hospital Medical Records at 1-2.)

Plaintiff alleges that his eye disorder prevents him from driving, causes migraines, and prevents him from reading voluminous materials. (Pl.'s Rule 56.1 Resp. ¶ 61.)  When Plaintiff was first diagnosed with an eye disorder, in or around September 2010, he could not see out of his right eye. (Def.'s Rule 56.1 Resp. ¶ 66.)  In September and October 2010, Plaintiff's vision problem was treated by Dr. Jeff Wongskhaluang, a senior resident in ophthalmology at Stroger Hospital. (Pl.'s Rule 56.1 Resp. ¶ 62.)  Dr. Wongskhaluang concluded that Plaintiff's vision probably did not limit his ability to work and that he was able to serve food on the line, prepare food in the kitchen, marinate and cut or shred meat, clean the dining room, and read. (Pl.'s Rule 56.1 Resp. ¶¶ 62-64; R. 89-9, Ex. JJJ, Wongskhaluang Dep. at 37:7-39:05.)  Plaintiff complained of discomfort when driving at night, so Dr. Wongskhaluang recommended that Plaintiff refrain from driving at night. (Pl.'s Rule 56.1 Resp. ¶ 63.)  Plaintiff informed Defendant that he had an eye disease and provided Defendant with a doctor's note stating that Plaintiff had "decreased vision especially at night and should not be driving at night." (Def.'s Rule 56.1 Resp. ¶ 67.) Plaintiff's hours were reduced after he informed Chavez that he could not drive at night. (*Id.* ¶ 71.)  Chavez told Plaintiff that she would schedule Plaintiff when she could, but "wasn't going to change the whole schedule around for one person." (*Id.*)

Defendant alleges that in May 2010, Plaintiff called off from work informing Kubicki that "they" had found a kidney match and he needed to be tested to make sure it was compatible. (Pl.'s Rule 56.1 Resp. ¶ 65.)  Plaintiff denies telling Kubicki this. (*Id.*)  Sometime in 2012, after

Plaintiff's termination, he was treated for a kidney disease by Dr. Albert Osei at Stroger Hospital. (*Id.* ¶ 66.) Dr. Osei determined from reviewing Plaintiff's medical file that Plaintiff's kidneys had not failed and were functioning properly. (*Id.*) Dr. Osei characterized Plaintiff's kidney disease as "not that severe." (*Id.*) Plaintiff had no physical limitations due to his kidney disease; the only implications of the kidney disease were limits on the amount of salt, phosphorus, potassium, and non-steroidal anti-inflammatories Plaintiff could consume. (*Id.*)

Plaintiff has been treated by Dr. Osei at Stroger Hospital for his hypertension since 2007. (*Id.* ¶ 67.) Dr. Osei testified that Plaintiff had no limitations at work due to hypertension, and that lifting would not affect Plaintiff's blood pressure. (*Id.* ¶ 67.) Dr. Osei did not consider Plaintiff's hypertension to be severe. (*Id.*) Plaintiff was also treated at Stroger Hospital by Dr. Michael Davidovich, a general internist, on two occasions, once in April 2009 and once in September 2010. (*Id.* ¶ 68; R. 90-1, Ex. MMM, Davidovich Dep. at 9:17-21.) Dr. Davidovich noted no limitations caused by Plaintiff's hypertension and kidney disease, and only recommended that Plaintiff exercise as much as possible and eat a low-sodium diet. (Pl.'s Rule 56.1 Resp. ¶ 68.)

Plaintiff alleges he was diagnosed with a hernia in 2009 and was restricted to lifting no more than ten pounds. (*Id.* ¶ 69.) Plaintiff alleges that his hernia made it very difficult for him to lift and that lifting heavy items caused him extreme pain. (Def.'s Rule 56.1 Resp. ¶ 65.) Plaintiff informed his managers of the lifting restriction at the time of his diagnosis and requested that someone else lift heavy items and take out the garbage. (*Id.*) Kubicki testified that Chavez told her that Plaintiff would, at times, refuse help and violate his lifting restrictions. (Pl.'s Rule 56.1 Resp. ¶ 69.) Plaintiff's hernia was surgically repaired on February 28, 2013. (*Id.* ¶ 70.)

14

On one occasion, on an unspecified date, Plaintiff alleges that he gave Chavez a note from his doctor and Chavez told him that he was terminated. (Def.'s Rule 56.1 Resp. ¶ 69.) Plaintiff asked to speak with someone in Human Resources, and Chavez called Kubicki, who told Chavez that she could not terminate Plaintiff. (*Id.*) Chavez burst out of her office, yelling expletives and saying, "I can't believe this. I can't get rid of this guy for nothing." (*Id.*) Plaintiff alleges that Chavez told him, "You're sick a lot, I don't think this job is for you," and that she told him on several occasions that he was too sick to work for Defendant. (*Id.* ¶ 70.) Chavez denied telling Plaintiff that he was sick a lot and too sick to work for Defendant. (*Id.*) Arrington testified that on some occasions, Chavez threw away doctors' notes Plaintiff had provided, claiming that she did not need them. (*Id.* ¶ 74.) Chavez stated that she did not throw away any of Plaintiff's doctors' notes and instead placed all of the notes in his file. (*Id.*)

When an employee of Defendant has a medical condition which requires an accommodation, the employee is to bring it to the attention of his General Manager. (*Id.* ¶ 72.) Documentation of accommodations is kept in the employee's confidential file. (*Id.*) The Area Manager and the Human Resources Department are, under Defendant's policy, always involved in responding to an employee's request for accommodation; however, Kubicki could not remember if she discussed with Plaintiff what accommodations he might need. (*Id.* ¶ 73.) On January 11, 2011, Kubicki told Triola that Plaintiff had not provided documentation of his need for accommodations. (*Id.*)

## VI. Plaintiff's Complaints about Discriminatory Treatment

Plaintiff alleges that he complained to O'Campo, Chavez, and Human Resource Generalist Esther Smiley in late 2009 to early 2010 regarding Chavez's management team cutting his hours, setting unrealistic time expectations, prohibiting breaks, micromanaging him,

failing to accommodate his medical restrictions, and failing to train or promote him, and their discriminatory, harassing, and retaliatory behavior against him. (Pl.'s Rule 56.1 Resp. ¶ 71.) Plaintiff alleges he made similar complaints to Kim in early 2010. (*Id.*) Defendant denies that Plaintiff complained to Kim that Defendant failed to accommodate his medical restrictions. (Def.'s Rule 56.1 Resp. ¶ 40.) After Chavez learned that Plaintiff had complained to Human Resources, she told Arrington and other managers that she was "pissed" at Plaintiff for going to Human Resources and instructed them to document every little thing Plaintiff did wrong, even if it was coming in to work one minute late. (*Id.* ¶ 42.) Arrington testified that Chavez "plotted" against Plaintiff, and that she had more than twenty conversations in which Chavez said that she wanted Plaintiff fired because he had complained. (*Id.* ¶ 43.) Chavez denies plotting against Plaintiff. (*Id.*)

Kim conducted an investigation of Plaintiff's complaints beginning in February 2010. (Pl.'s Rule 56.1 Resp. ¶ 74.) As part of her investigation, Kim interviewed Plaintiff, management, and crew members. (*Id.*) Some of the crew members told her that Plaintiff did not always greet or address coworkers when arriving to work, fell behind easily, often needed help closing, and took playful banter between the crew too seriously. (*Id.*; R. 97-1, Ex. 8, Kim Dep. at 189:10-22.) After interviewing and investigating Plaintiff's complaints, Kim alleged that she saw no signs of discrimination or harassment. (Pl.'s Rule 56.1 Resp. ¶ 74.) Kim determined that Plaintiff was not meeting expectations, following procedures, working with a sense of urgency, or communicating with his team. (*Id.*) Kim also investigated whether Plaintiff's hours had been drastically cut and learned that Plaintiff requested days off due to his doctor appointments but expected to receive full-time hours by being scheduled on every day that he had not requested off, a request that Chavez could not accommodate without sufficient notice. (*Id.* ¶ 75; R. 97-1,

Ex. 8, Kim Dep. at 220:23-223:19.) Arrington testified that Plaintiff was one of the few employees who informed managers of his doctor appointments weeks in advance. (Pl.'s Rule 56.1 Resp. ¶ 75.)

Plaintiff complained to Kim that Chavez refused to accommodate his lifting restrictions, and he requested to meet with then-Area Manager Jacob Sumner. (Def.'s Rule 56.1 Resp. ¶ 46.) On February 25, 2010, Sumner, Chavez, and Arrington met with Plaintiff to discuss his complaints. (*Id.*) Plaintiff alleges that Sumner apologized for lapses and inconsistencies in his training, told Plaintiff "we dropped the ball on your training," and instructed Chavez to cross-train Plaintiff and abide by his medical restrictions. (*Id.*) After the meeting with Sumner, Arrington saw Plaintiff lifting garbage (weighing up to 50 or 60 pounds), cases of steak (weighing approximately 30 pounds), and cases of lettuce (weighing approximately 30 pounds). (*Id.* ¶ 77.) Guerrero also saw Plaintiff carrying garbage and dishes (weighing 10 to 20 pounds) without any help. (*Id.*)

Plaintiff filed a Charge of Discrimination with the EEOC on March 5, 2010. (*Id.* ¶ 44.) Plaintiff gave Chavez a copy of the EEOC Charge. (*Id.*) Plaintiff alleges that after he filed his EEOC Charge, he was micromanaged more often and it was impossible for him to take breaks. (Pl.'s Rule 56.1 Resp. ¶ 76.) Plaintiff alleges that Chavez required him to sit with her for as much as ninety minutes per shift, which caused him to fall behind on his prep. (Def.'s Rule 56.1 Resp. ¶ 50.) Chavez also forced Plaintiff to work on the line at the busiest times of the day without training. (*Id.* ¶ 51.) Defendant alleges that Chavez spent more time with Plaintiff attempting to train him properly and prepare him for future development and cross training, as Chavez was instructed to do. (*Id.*) Chavez testified that the training she gave Plaintiff was not the cause of him falling behind on his prep. (*Id.*)

Arrington testified that when Chavez learned about Plaintiff's EEOC Charge, she freaked out and ranted about it and said that Plaintiff "had to go." (*Id.* ¶ 45.) Chavez denied that she said Plaintiff had to go. (*Id.*) Kubicki told Arrington and Guerrero to document any incident involving Plaintiff, and she told Guerrero that Plaintiff had filed a lawsuit against Defendant. (*Id.* ¶ 53.) Arrington testified that Defendant's managers were "looking for stuff" on Plaintiff to document. (*Id.* ¶ 54.) Guerrero testified that Plaintiff was under the microscope and that it was "ridiculous documenting everything" because they did not do that with any other employee. (*Id.* ¶ 55.) Managers typically write in employees' Development Journals every month, and in the eleven months that Chavez had worked with Plaintiff before February 2010, managers had written in Plaintiff's Development Journal five times. (*Id.* ¶ 48.) Between February 27, 2010, and March 23, 2010, however, Chavez and other managers made six entries in Plaintiff's Development Journal about Plaintiff's performance errors. (*Id.* ¶ 47.) In February and March 2010, there were 17 Dear Diary entries regarding Plaintiff's alleged performance problems. (*Id.* ¶ 49.) After March 2010, there were no additional Dear Diary entries regarding Plaintiff until December 2010. (*Id.*)

After Plaintiff filed his EEOC Charge, Kim offered to transfer him to a different restaurant, but Plaintiff declined the offer. (Pl.'s Rule 56.1 Resp ¶ 76.) Plaintiff alleges that he declined the offer because he felt that transferring would simply have a "Band-Aid effect" rather than solving the problem of discrimination at the Oak Park Restaurant. (*Id.*) Kim alleges that she investigated but did not find any change in treatment towards Plaintiff by the management team after he filed his first complaint. (*Id.*) Kim testified that after Plaintiff filed his EEOC Charge, Triola took over the investigation from her, and her involvement in Plaintiff's case ended. (*Id.*)

18

Triola monitored Plaintiff's performance after he filled his EEOC charge. (Def.'s Rule 56.1 Resp. ¶ 63.) One of Triola's responsibilities as Human Resources Director was to act as the liaison with outside counsel on EEOC charges, which included gathering documents and sending updates for complaining employees' files. (*Id.* ¶ 64.) On January 3, 2011, Triola asked Kubicki for Plaintiff's most recent Development Journal entries. (*Id.* ¶ 63) On January 13, 2011, Triola told Kubicki he was working with Defendant's attorney on drafting a Development Journal entry "to deal with the attendance issue" and that Defendant's attorney would be interviewing Kubicki and Thanawutthikorn "with the sense 'this won't end well with Bob' – we want to be prepared." (*Id.*) On January 20, 2011, Triola asked Thanawutthikorn to send Plaintiff's Development Journal, work schedules, and the Dear Diary to Defendant's counsel. (*Id.*) On March 8, 2011, in response to Kubicki's report that only one Development Journal entry had been completed since the beginning of the year, Triola responded, "Yah, not good." (*Id.*) Triola could not recall an employee other than Plaintiff for whom he continued to send records to outside counsel after Defendant filed a position statement with the EEOC. (*Id.* ¶ 64.)

## VII.   Plaintiff's Workplace Injury

Plaintiff claims that he fell while taking out the garbage on December 23, 2010. (*Id.* ¶ 79.) Defendant alleges that Plaintiff first reported his injury to Thanawutthikorn on December 26, 2010. (*Id.*) Plaintiff alleges that he told Thanawutthikorn about his injury the day it occurred. (*Id.*; R. 97-1, Ex. 3, Pl.'s Dep. at 199:12-24.) Defendant alleges that Thanawutthikorn informed Kubicki that he "went to call in the claim and [Plaintiff] told him he did not want him to. [Plaintiff] said he contacted his doctor and he diagnosed it over the phone as Sciatica and prescribed Vicodin." (Pl.'s Rule 56.1 Resp. ¶ 79.) Plaintiff denies telling Thanawutthikorn that he did not want him to call in the claim. (*Id.*; R. 97-1, Ex. 3, Pl.'s Dep. at 199:15-200:1.)

19

Thanawutthikorn reported the worker's compensation claim on January 14, 2011. (Pl.'s Rule 56.1 Resp. ¶ 79.) Plaintiff was treated by Concentra Medical Center as a result of this claim and was diagnosed with a hip/thigh sprain/strain. (*Id.* ¶ 80.) Defendant paid for Plaintiff's subsequent doctor's visits and treatment. (*Id.*) The treating physician and physical therapist imposed restrictions on Plaintiff's activities, including lifting, prolonged standing/walking pushing/pulling, squatting, and climbing stairs/ladders. (Def.'s Rule 56.1 Resp. ¶ 78.) Concentra faxed the documents to the restaurant and Plaintiff also gave them to Thanawutthikorn. (*Id.*)

In early January 2011, Plaintiff complained to Kubicki that Thanawutthikorn refused to accommodate his injury because Thanawutthikorn was racist. (Pl.'s Rule 56.1 Resp. ¶ 77.) Kubicki alleges that she and her supervisor, Ed Berg, investigated Plaintiff's complaint and learned from Plaintiff that he respected Thanawutthikorn and thought that he had improved the restaurant. (*Id.*) Plaintiff denies telling Kubicki that he respected Thanawutthikorn or thought that Thanawutthikorn had improved the restaurant. (*Id.*) Plaintiff alleges that because Thanawutthikorn refused to accommodate his medical limitations, Plaintiff's treating physician told Defendant that Plaintiff could not work until he was released. (Def.'s Rule 56.1 Resp. ¶ 79.) Plaintiff did not work from January 21, 2011 until February 9, 2011 as a result of his injury. (Pl.'s Rule 56.1 Resp. ¶ 80.) On February 10, 2011, Plaintiff returned to working a normal schedule. (*Id.*) Upon his return, Plaintiff asked Thanawutthikorn to be paid for the days he missed. (Def.'s Rule 56.1 Resp. ¶ 80.) Plaintiff was discharged from treatment on or about February 25, 2011. (Pl.'s Rule 56.1 Resp. ¶ 80.)

## PROCEDURAL HISTORY

Plaintiff initiated this action on February 2, 2012. (R. 1, Compl.) On January 15, 2013, Plaintiff filed his ten-count amended complaint. (R. 48, Am. Compl.) In Count I, Plaintiff alleges discrimination on the basis of race in violation of Title VII, (*id.* ¶¶ 33-38); in Count II, he alleges discrimination on the basis of national origin in violation of Title VII, (*id.* ¶¶ 39-44); in Count III, he alleges discrimination on the basis of race, color, and ethnicity in violation of Section 1981, (*id.* ¶¶ 45-49); in Count IV, he alleges retaliation in violation of Title VII, (*id.* ¶¶ 50-57); in Count V, he alleges discrimination on the basis of age in violation of the ADEA, (*id.* ¶¶ 58-63); in Count VI, he alleges retaliatory discharge in violation of Illinois state law, (*id.* ¶¶ 64-69); in Count VII, he alleges retaliation in violation of the ADEA, (*id.* ¶¶ 70-76); in Count VIII, he alleges discrimination on the basis of disability in violation of the ADA, (*id.* ¶¶ 77-83); in Count IX, he alleges failure to accommodate in violation of the ADA, (*id.* ¶¶ 84-88); and in Count X, he alleges retaliation in violation of the ADA, (*id.* ¶¶ 89-95). Defendant answered Plaintiff's amended complaint on January 21, 2013, (R. 50, Ans.), and moved for summary judgment on August 26, 2013, (R. 82, Def.'s Mot. Summ. J.). Plaintiff responded to Defendant's motion for summary judgment on October 4, 2013, (R. 96, Pl.'s Resp.), and filed a corrected memorandum of law in opposition to summary judgment on October 9, 2013, (R. 101, Pl.'s Mem.). Defendant replied to Plaintiff's memorandum in opposition to summary judgment on October 25, 2013. (R. 102, Def.'s Reply.)

## LEGAL STANDARDS

Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). "A disputed fact is 'material' if it might affect the outcome of the suit under

21

governing law." *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Id.* at 255; *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) ("[D]istrict courts are not required to draw every requested inference; they must only draw reasonable ones that are supported by the record.") The moving party has the initial burden of demonstrating that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). The moving party "can prevail just by showing that the other party has no evidence on an issue on which that party has the burden of proof." *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1183 (7th Cir. 1993).

Once the moving party has met this burden, the nonmoving party must "come forward with specific facts demonstrating that there is a genuine issue for trial." *Wheeler*, 539 F.3d at 634. "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement. The nonmoving party must show that there is evidence upon which a jury reasonably could find for the plaintiff." *Id.* (citing *Anderson*, 477 U.S. at 251-52.) The nonmoving party may not rely on "mere conclusions and allegations" to create a genuinely disputed issue of material fact. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003). Instead, the nonmoving party "must make a showing sufficient to establish any essential element of her cause of action for which she will bear the burden of persuasion at trial." *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 425 (7th Cir. 1997); *see also*

22

*Celotex*, 477 U.S. at 322-23. Weighing evidence and making credibility decisions are jury functions, and it is not appropriate for a judge to assume those functions when ruling on a motion for summary judgment. *Anderson*, 477 U.S. at 255. Accordingly, the Court "appl[ies] the summary judgment standard with special scrutiny to employment discrimination cases, which often turn on issues of intent and credibility." *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002).

On summary judgment, the Court limits its analysis of the facts to the evidence that is presented in the parties' Local Rule 56.1 statements. *See Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000) (referring to Local Rules 12(M) and (N), which were replaced by Local Rule 56). To adequately dispute a statement of fact, the opposing party must cite specific support in the record; an unsubstantiated denial or a denial that is mere argument or conjecture is not sufficient to create a genuinely disputed issue of material fact. *Malec v. Sanford*, 191 F.R.D. 581, 585 (N.D. Ill. 2000); *see also Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008).

## ANALYSIS

I.  **Plaintiff's Race, National Origin, and Age Discrimination Claims (Counts I, II, III, and V)**

In Counts I, II, III, and V, Plaintiff alleges that, in failing to promote or train him and in terminating his employment, Defendant discriminated against him based on his race, national origin, and age in violation of Title VII, Section 1981, and the ADEA. (R. 48, Am. Compl. ¶¶ 35, 47, 60.) Title VII and Section 1981 prohibit employers from discriminating against their employees on the basis of race or national origin. 42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 1981; *see Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 337-38 (7th Cir. 2002). Similarly, the ADEA prohibits employers from discriminating against their employees on the basis of age. 29

23

U.S.C. § 623(a)(1). Discrimination claims under Title VII, Section 1981, and the ADEA are analyzed in the same manner, and this Court will thus analyze all three claims together. *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008); *Patton*, 276 F.3d at 338.

A plaintiff may prove discrimination under Title VII, Section 1981, and the ADEA through the direct or indirect methods of proof. *Atanus*, 520 F.3d at 671; *Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007).[3] A plaintiff may prevail under the direct method of proof either by presenting direct evidence of intentional discrimination or "by constructing a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decision-maker.'" *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)). If a plaintiff relies on circumstantial evidence, the evidence "must point directly to a discriminatory reason for the employer's action." *Id.* (quoting *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003)). Circumstantial evidence that can form a convincing mosaic fall into three categories: (1) suspicious timing, ambiguous statements, "behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn," *Troupe*, 20 F.3d at 736; (2) evidence "that similarly situated employees were treated differently," *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir.

---

[3] The Supreme Court has held that to prevail under the ADEA, a plaintiff must show that age was the but-for cause of the adverse employment action. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009). Post-*Gross*, the Seventh Circuit continues to apply the direct and indirect methods when analyzing ADEA claims. *See Fleishman v. Continental Cas. Co.*, 698 F.3d 598, 604 (7th Cir. 2012) ("we have continued to apply the *McDonnell Douglas* burden-shifting framework in summary judgment cases that proceed under the indirect method of proof, a question *Gross* explicitly left open") (citing *Senske v. Sybase*, 588 F.3d 501, 506-07 (7th Cir. 2009))); *Hnizdor v. Pyramid Mouldings, Inc.*, 413 F. App'x 915, 917 (7th Cir. 2011); *Mach v. Will Cnty. Sheriff*, 580 F.3d 495, 499 (7th Cir. 2009) (applying the direct method of proof); *see also Yee v. UBS O'Connor, LLC*, No. 07 C 7150, 2010 WL 1640192, at *17 (N.D. Ill. April 22, 2010) ("*Gross* did not equate the burden of proof in an ADEA case with the method of presenting that proof.").

2012) (quoting *Volovsek v. Wisc. Dep't of Agr., Trade & Consumer Prot.*, 344 F.3d 680, 689 (7th Cir. 2003)); and (3) "evidence that the employer offered a pretextual reason for an adverse employment action," *Coleman*, 667 F.3d at 860 (internal citations and quotation marks omitted). "Each type of evidence is sufficient by itself (depending of course on its strength in relation to whatever other evidence is in the case) to support a judgment for the plaintiff; or they can be used together." *Troupe*, 20 F.3d at 736.

A plaintiff that has failed to establish discriminatory intent under the direct method may nonetheless prevail under the indirect method of proof—the burden-shifting approach first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Brewer*, 479 F.3d at 915. Under the indirect method of proof, a plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. To establish a *prima facie* case of discrimination, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was meeting the defendant's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) the defendant treated similarly situated employees outside of the protected class more favorably. *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007). Once a plaintiff establishes a *prima facie* case, he creates a rebuttable presumption of employment discrimination, and the burden of production shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its actions. *Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1261 (7th Cir. 1993) (quoting *McDonnell Douglas*, 411 U.S. at 802). If the defendant cannot satisfy its burden, summary judgment will be denied. *See Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2005). If the defendant does provide noninvidious reasons for its actions, the burden shifts back to the plaintiff to show that the articulated reasons were pretextual. *Hong*, 993 F.2d at 1261.

The Seventh Circuit has found that the second and third categories of circumstantial evidence under the direct method (the similarly situated inquiry and pretext inquiry) are similar to the requirements to establish a *prima facie* case under the indirect method, and thus the Court's "analyses overlap." *Coleman*, 667 F.3d at 860 n.8 (citing *Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 851 (7th Cir. 2010)); *see also Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490-91 (7th Cir. 2007) (explaining that the indirect method "involves a subset of circumstantial evidence (including the disparate treatment of similarly situated employees) that conforms to the prescription of [*McDonnell Douglas*]").

Plaintiff alleges that he was subjected to three adverse employment actions: (1) he was terminated; (2) he was denied training opportunities; and (3) he was denied promotions. (R. 101, Pl.'s Mem. at 3-4, 13.) Defendant argues that the Court should not consider Plaintiff's failure to train claim because he did not allege failure to train in his EEOC Charge or his complaint. (R. 82-1, Def.'s Mem. at 7.) A discriminatory failure to train claim is distinct from a failure to promote claim, and therefore, failure to train must be pleaded as a separate wrong. *Maarouf v. Walker Mfg. Co., Div. of Tenneco Automotive, Inc.*, 210 F.3d 750, 753 (7th Cir. 2000) (citing *Pafford v. Herman*, 148 F.3d 658, 669 (7th Cir. 1998)). Plaintiff alleged in his EEOC Charge that his "management training was stopped but the training for younger, non-Black, non-Nigerian Management Trainees continued." (R. 48-1, Ex. A, EEOC Charge at 1.) Thus, the Court finds that Plaintiff's EEOC Charge sufficiently alleged a failure to train claim. In addition, Plaintiff alleges in his complaint that "[w]ithin several weeks of his start, Chipotle terminated [Plaintiff's] management training," and that a "younger, Caucasian, and presumably American-born employee who started as Associate/Management Trainee at the same time as [Plaintiff] was allowed to continue training and ultimately promoted to General Manager of a different area

Chipotle restaurant." (R. 48, Am. Compl. ¶¶ 12-13.) Plaintiff explicitly incorporates these facts

into Counts I, II, III, and V. (*Id.* ¶¶ 33, 39, 45, 58.) Viewing these facts and drawing all

inferences in favor of Plaintiff, the Court finds that Plaintiff pleaded a discriminatory failure to

train claim in the complaint, and the Court now turns to analyze the merits of Defendant's

motion for summary judgment on the claim.

### A.     Whether Plaintiff's termination was discriminatory

Plaintiff argues that he suffered an adverse employment action when he was terminated.

(R. 101, Pl.'s Mem. at 13.) Plaintiff seeks to avoid summary judgment on his discriminatory

termination claim via the direct method of proof by supplying circumstantial evidence. (*Id.*)

Specifically, he argues that the facts give rise to an inference that Defendant's reasons for

terminating him are pretexual. (*Id.*) "The employee may succeed in his demonstration of pretext

by offering evidence that the employer's ostensible justification is unworthy of credence."

*Adreani v. First Colonia Bankshares Corp.*, 154 F.3d 389, 396 (7th Cir. 1998) (internal citations

and quotation marks omitted). The employee may accomplish this showing with evidence

"tending to prove that the employer's proffered reasons are factually baseless, were not the

actual motivation for the discharge in question, or were insufficient to motivate the discharge."

*Id.* (quoting *Testerman v. EDS Technical Prods. Corp.*, 98 F.3d 297, 303 (7th Cir. 1996)).

"Although general averments of adequate performance are insufficient to create a factual issue

on summary judgment even when corroborated by statements of supervisors or co-workers, a

plaintiff may create an issue of fact by specifically refuting facts that allegedly support the

employer's claim of performance deficiencies." *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446,

1460 (7th Cir. 1994).

Defendant states that it terminated Plaintiff because of his "poor performance, insubordination, and failure to follow basic Chipotle policies and procedures." (R. 82-1, Def.'s Mem. at 9.) The position statement Defendant submitted to the EEOC states that Plaintiff was terminated for unexcused absences, poor performance, inability to meet Defendant's reasonable expectations, violations of Defendant's Food Safety Policies and Procedures, and insubordination. (R. 101, Pl.'s Mem. at 15; R. 97-4, Ex. 33, Def.'s Position Statement.) The termination memorandum Plaintiff received described several incidents in which Plaintiff violated Food Safety Policies and was insubordinate. (R. 97-3, Ex. 25, Termination Mem.) Plaintiff denies that any of the events described in the termination memorandum occurred—he denies leaving a soiled towel in the prep are on February 28, 2011; he denies eating a bell pepper while cutting it on March 1, 2011; and he denies cursing at Garcia and throwing dishes on March 4, 2011. (R. 101, Pl.'s Mem. at 13.) Plaintiff points to the testimony of Guerrero, who said she never saw Plaintiff leave a soiled towel in the prep area and could not remember if she saw Plaintiff eat a bell pepper while cutting it. (*Id.* at 14.) The termination memorandum states that Guerrero heard Plaintiff say "God damn it," but Guerrero testified that she never heard Plaintiff use profanity and never saw him throw dishes or be insubordinate. (*Id.*) Plaintiff also denies the occurrence of other incidents that Defendant notes as examples of his poor performance, such as the guacamole incident, (Pl.'s Rule 56.1 Resp. ¶ 21), and the incident involving two cases of chicken, (Def.'s Rule 56.1 Resp. ¶ 23). Plaintiff points to Arrington's testimony describing Plaintiff as an "Ace in his Place" to further counter Defendant's allegations that he was not meeting Defendant's expectations. (Pl.'s Rule 56.1 Resp. ¶ 18.) Plaintiff also offers Arrington's testimony that Plaintiff never frightened her and that he was always professional and polite to counter Defendant's assertions that Plaintiff was insubordinate. (*Id.*) Finally, Plaintiff counters

28

Defendant's assertions that Plaintiff had several unexcused absences by providing time sheets indicating the times he clocked in, (*id.* ¶ 36), and testimony that the schedules posted were not always the final schedules, (*id.* ¶ 37).

The evidence Plaintiff offers to prove that Defendant's reasons for firing him are pretextual goes beyond general assertions of adequate job performance and directly addresses the specific performance deficiencies identified by Defendant. The Court thus finds that Plaintiff has provided sufficient evidence to raise a factual issue as to whether Defendant's justifications for terminating him are credible or merely a pretext for discrimination. *See Dey*, 28 F.3d at 1460 (finding that a plaintiff who denied that certain events ever took place and specifically addressed the complaints of uncooperative behavior made by her employer presented enough evidence to permit a reasonable finder of fact to infer that the employer fabricated the reason for her dismissal).

Defendant attempts to refute Plaintiff's pretext argument by asserting that Plaintiff has presented no evidence that Kubicki or Triola, the individuals who made the decision to fire Plaintiff, did not believe the events articulated in the termination memorandum. (R. 102, Def.'s Reply at 9.) If the employer honestly believed its reasons for discharging the employee, the employee cannot meet his burden of proving pretext. *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001). This is true even if the employer's reasons for discharging the employee are "foolish or trivial or even baseless." *Id.* (quoting *Brill v. Lante Corp.*, 119 F.3d 1266, 1270 (7th Cir. 1997). "A determination of whether a belief is honest is often conflated with analysis of reasonableness." *Flores v. Preferred Technical Grp.*, 182 F.3d 512, 516 (7th Cir. 1999). A court therefore does not have to take an employer at its word. *Gordon*, 246 F.3d at 889. "When an employee provides 'a detailed refutation of events which underlie the

employer's negative performance assessment,' the employee demonstrates 'that the employer may not have honestly relied on the identified deficiencies in making its decision.'" *Id.* (quoting *Dey*, 28 F.3d at 1460-61). As discussed above, Plaintiff has provided a detailed refutation of the specific performance deficiencies identified by Defendant and, consequently, has demonstrated that Kubicki and Triola may not have honestly relied on the deficiencies outlined in the termination memorandum in making their decision to terminate Plaintiff.

Because the evidence may allow a fact finder to "reasonably infer that unlawful discrimination was the true motivation," *Adreani*, 154 F.3d at 395, Plaintiff has met his burden under the direct method and avoided summary judgment on his discriminatory termination claim.

**B.** **Whether Defendant's decision to not promote and train Plaintiff was discriminatory**

Plaintiff also alleges that he suffered adverse employment actions when Defendant refused to promote and train him. (R. 101, Pl.'s Mem. at 3-4.) Plaintiff groups these two adverse actions together and presents the same circumstantial evidence to show that Defendant's denial of promotion and training opportunities was discriminatory. (*Id.*) First, Plaintiff argues that throughout the time Chavez managed him, she made statements that give rise to an inference that she did not train or promote him because of his race, national origin, and age. (*Id.* at 5.) Plaintiff points to the following statements Chavez made to him: (1) Chavez explicitly stated that Plaintiff was not going to be promoted; (2) Chavez called Plaintiff "Bobo," which he alleges is a monkey's name, and made fun of his accent; (3) Chavez asked Plaintiff whether he was getting ready to retire; and (4) after Chavez had terminated an African-American employee, she told Plaintiff, "Bob, you're a survivor. I've been wanting to fire you." (*Id.*) Defendant argues that Chavez's comments were simply stray remarks that were not made contemporaneously with any adverse employment action. (R. 102, Def.'s Reply at 4-5.)

30

"Isolated comments that are no more than 'stray remarks' in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus," unless the remark was made by the decision-maker "(1) around the time of, and (2) in reference to, the adverse employment action." *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006) (quoting *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 652 (7th Cir. 2000)). Because Plaintiff has not provided evidence to prove that Chavez made these comments during or near any denial of a promotion or training opportunity, the Court cannot find that these comments alone are sufficient to establish a discriminatory inference. However, the Court must examine Plaintiff's circumstantial evidence as a whole. *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 644 (7th Cir. 2013) ("[T]ogether with other facts, evidence that would be insufficient standing alone can be sufficient to defeat summary judgment if a reasonable jury ultimately could conclude that the plaintiff was the victim of illegal discrimination or retaliation.") (internal citations and quotation marks omitted).

Plaintiff also alleges that Chavez made statements that give rise to an inference that she was biased against African-Americans generally. (R. 101, Pl.'s Mem. at 5.) For example, Plaintiff alleges that Chavez told a newly-hired African-American employee, "I hope you don't get mad, but I like to make black jokes," and that Chavez made derisive comments about Arrington's daughter, who is half African-American. (*Id.* at 6.) Further, an investigation leading to Chavez's termination found that two employees had complained that Chavez made racial jokes about African-Americans. (*Id.*) The Court recognizes the comments Chavez directed at other employees in the protected group as one type of circumstantial evidence. *Troupe*, 20 F.3d at 736.

Plaintiff next argues that the documentation Defendant relies on to support its reasons for not training or promoting Plaintiff contain serious flaws that give rise to an inference of pretext. (R. 101, Pl.'s Mem. at 6.) Defendant claims that Plaintiff was not promoted because he was not qualified and was not meeting Defendant's expectations. (R. 82, Def.'s Mem. at 5-7.) Plaintiff argues that on eleven occasions on which he allegedly committed violations of Defendant's policies and procedures, he was not at work, and therefore these write-ups were fabricated. (R. 101, Pl.'s Mem. at 6.) Defendant attempts to explain this discrepancy by asserting that "it is evident that Chipotle's management simply documented instances of Plaintiff's improper behavior and poor performance in days following the poor performance." (R. 102, Def.'s Reply at 7.)

Additionally, Plaintiff provides circumstantial evidence regarding his Performance Discussions. Plaintiff alleges that the five Performance Discussions Defendant claims were in Plaintiff's personnel file were not prepared in accordance with Defendant's policies because they were not signed by Plaintiff or a manager and Plaintiff never received them. (R. 101, Pl's Mem. at 6.) Plaintiff cites *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 723 (7th Cir. 2005), for the proposition that a defendant's failure to follow its own internal procedures can point to a discriminatory motivation. (*Id.*) Defendant argues that *Rudin* does not apply because in that case there were written guidelines that the employer failed to follow, whereas here there is no written policy requiring Defendant's managers to obtain an employee's signature on all Performance Discussions. (R. 102, Def.'s Reply. at 7.) Although there is no written policy, Plaintiff has provided the deposition testimony of two Human Resources employees who both explained that under Defendant's policy, a manager is supposed to obtain an employee's signature on performance discussions. (R. 97-1, Ex. 8, Kim Dep. at 87:06-20; R. 97-1, Ex. 10,

32

Triola Dep. at 69:14-70:03.) Defendant's distinction between this case and *Rudin* is therefore immaterial because there is a policy in place. Therefore, Defendant's failure to follow its policy regarding the Performance Discussions is evidence of pretext that the Court will consider.

Plaintiff additionally alleges that the circumstances surrounding his May 2010 performance evaluation suggest that it was prextual. (R. 101, Pl.'s Mem. at 7.) At Triola's request, Chavez added more details to Plaintiff's evaluation so that it would not appear as though she was "picking" on Plaintiff. (*Id.* at 8.) Plaintiff alleges that one specific incident described in the revised evaluation—where Plaintiff allegedly lost two cases of chicken due to improper rotating—was false. (*Id.*) Plaintiff argues that this "raises a question of whether, based on Triola's instructions, Chavez added information to the evaluation that she knew to be false." [4] (*Id.*) Viewing Plaintiff's circumstantial evidence of pretext as a whole, the Court finds that Plaintiff has created a factual issue as to whether Defendant's reasons for not promoting or training him are credible or pretexual. *See Hobgood*, 731 F.3d at 644; *Patmythes v. City of Janesville*, 181 F. App'x 596, 598 (7th Cir. 2006) ("Even if the plaintiff's evidence does not compel the conclusion that his employer discriminated against him, if there is a question of fact as to the believability of an employer's purported reasons for an employment decision then at a bare minimum it suffices to defeat the employer's summary judgment motion.") (quoting *Rudin*, 420 F.3d at 726) (internal quotation marks omitted)).

---

[4] Plaintiff also argues that the dispute over what position Plaintiff was hired for is further evidence of pretext. (R.101, Pl.'s Mem. at 4, 9.) Defendant claims that Plaintiff was hired as a crew member, (R. 102, Def.'s Reply at 8), and Defendant's records indicate that Plaintiff's job title when he was hired was "cashier," (R. 84-8, Ex. N, Employee Information Form). Plaintiff, however, alleges that he was hired as a general manager trainee on a fast-track to management. (R. 101, Pl.'s Mem. at 9.) Plaintiff and Defendant agree that Plaintiff's training was stopped shortly after Plaintiff started working. (*Id.*; R. 102, Def.'s Reply at 8.) Defendant never claims that it stopped training Plaintiff because he was hired only as crew member, and the Court thus finds no evidence of pretext as to why Defendant stopped training Plaintiff in the parties' disagreement over the exact position for which Plaintiff was hired.

Considering all of Plaintiff's circumstantial evidence together—the evidence of pretext and Chavez's statements toward Plaintiff and other African-Americans—the Court finds that Plaintiff has constructed a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination. *See Hobgood*, 731 F.3d at 644; *Troupe*, 20 F.3d at 736. Accordingly, Plaintiff's race, national origin, and age discrimination claims (Counts I, II, III, and V) survive summary judgment.

## II. Plaintiff's Disability Discrimination and Failure to Accommodate Claims (Counts VIII and IX)

In Count VIII, Plaintiff alleges that he was discriminated against based on his disabilities in violation of the ADA when Defendant failed to promote or train him and when Defendant terminated his employment. (R. 48, Am. Compl. ¶ 80.) In Count IX, Plaintiff alleges that Defendant failed to reasonably accommodate his disabilities in violation of the ADA. (*Id.* ¶ 86.) The ADA prohibits employers from discriminating against employees on the basis of their disability. 42 U.S.C. § 12112(a). Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee," unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). Thus, "the ADA requires employers to reasonably accommodate the limitations of [their] disabled employees." *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005). To invoke protection under the ADA, a plaintiff must first prove that he is disabled within the meaning of the ADA. *Cassimy v. Bd. of Educ. of Rockford Pub. Sch., Dist. No. 205*, 461 F.3d 932, 935-36 (7th Cir. 2006).

A.    **Whether Plaintiff's impairments are disabilities**

The ADA defines a disability as: (A) a physical or mental impairment that substantially

limits one or more major life activities of the individual; (B) a record of such an impairment; or

(C) being regarded as having such an impairment. 42 U.S.C. § 12102(1). Notably, the ADA

was amended in 2008 to make the standard for qualifying as disabled more inclusive. ADA

Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110–325, 122 Stat. 3553 (effective January

1, 2009). "The question of whether an individual meets the definition of disability under [the

ADA] should not demand extensive analysis." 29 C.F.R. § 1630.1(c)(4). Following the 2008

amendments to the ADA, the term "substantially limits" is to be construed broadly in favor of

expansive coverage. 29 C.F.R. § 1630.2(j)(1)(i).

Defendant argues that Plaintiff's alleged medical conditions are not disabilities as defined

by the ADA because they are "either fictitious, temporary, or do not substantially limit any major

life activity." (R. 82-1, Def.'s Mem. at 11-12.) Plaintiff argues that his impairments, including a

hernia, eye disease, hypertension, and kidney disease,[5] are disabilities because they

"substantially limit him in several major life activities, including lifting, seeing, standing, and

walking." (R. 101, Pl.'s Mem. at 20.) Lifting, seeing, standing, and walking qualify as "major

life activities." 42 U.S.C. § 12102(2)(A). "An impairment need not prevent, or significantly or

severely restrict, the individual from performing a major life activity in order to be considered

substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii). The question is whether a plaintiff is

---

[5]  Although Plaintiff alleges in his complaint that he suffers from a congenital heart disorder, (R. 48, Am. Compl. ¶ 17), Plaintiff does not mention a congenital heart disorder along with his other impairments in his response to Defendant's motion for summary judgment. The Court thus considers Plaintiff's argument that his alleged congenital heart disorder is a disability to be waived. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003) (deeming the plaintiff's negligence claim abandoned because he failed to delineate it in his brief in opposition to summary judgment); *Laborers' Int'l Union v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (stating that arguments not presented in response to summary judgment motions are waived).

limited "as compared to most people in the general population." *Id.* Plaintiff alleges that he suffered from a hernia that made it very difficult for him to lift and caused him extreme pain. (R. 101, Pl.'s Mem. at 20.) Plaintiff's doctors imposed a ten-pound lifting restriction on him, and Plaintiff thus contends that his hernia substantially limited him in the major life activity of lifting. (*Id.*) Defendant argues that because a hernia is a temporary impairment that can be resolved with surgery, it cannot be substantially limiting. (R. 102, Def.'s Reply at 16.) Defendant's interpretation of the law, however, is inaccurate. "The effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section." 29 C.F.R. 1630.2(j)(1)(ix). In pre-ADAAA cases, the Seventh Circuit held that lifting restrictions were not substantial limitations. *Serednyi v. Beverly Healthcare, LLC*, 656 F.3d 540, 555 (7th Cir. 2011) (citing *Zahurance v. Valley Packaging Indus., Inc.*, 397 F. App'x 246, 248 (7th Cir. 2010); *Mays v. Principi*, 301 F.3d 866, 869 (7th Cir. 2002); *Mack v. Great Dane Trailers*, 308 F.3d 776, 781 (7th Cir. 2002)).[6] The Seventh Circuit has not addressed the issue of whether lifting restrictions are substantial limitations under the standard outlined in the ADAAA. A court in this District, however, applying the ADAAA standard, found that a plaintiff's lifting restriction did substantially limit a major life activity. *Heatherly v. Portillo's Hot Dogs, Inc.*. No. 11 C 8480, 2013 WL 3790909, at *6 (N.D. Ill July 19, 2013) (finding that a plaintiff, who by doctor's orders had to refrain from heavy lifting while pregnant, had presented sufficient evidence to create a triable issue of fact as to whether her high risk pregnancy rendered her disabled under the ADAAA). Based on this Court's reading of the ADAAA and viewing the

---

[6] The ADAAA, which went into effect on January 1, 2009, did not apply retroactively. *Fredricksen v. United Parcel Serv., Co.*, 581 F.3d 516, 521 n.1 (7th Cir. 2009) (citing *Lytes v. DC Water and Sewer Auth.*, 572 F.3d 936, 939-42 (D.C. Cir. 2009)). The Seventh Circuit applied the law in place prior to the ADAAA in *Serednyi* and *Zahurance* because the events in those cases occurred prior to January 1, 2009.

evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff's hernia constituted a disability that substantially limited the major life activity of lifting.

Plaintiff also contends that his eye disease "interferes with his vision, prevents him from driving, causes him headaches, makes it difficult for him to read voluminous documents, and causes his eye to leak fluid." (R. 101, Pl.'s Mem. at 20.) When Plaintiff was first diagnosed with an eye disorder, he could not see out of his right eye. (*Id.*) His doctor testified that Plaintiff's eye sight improved over the following months, (R. 89-9, Ex. JJJ, Wongskhaluang Dep. at 31:1-3; 40:17-20), but as explained above, even temporary impairments can be substantially limiting, 29 C.F.R. 1630.2(j)(1)(ix). Accordingly, the Court finds that Plaintiff's eye disease constituted a disability that substantially limited the major life activity of seeing.

Plaintiff alleges that he also suffered from hypertension and kidney disease, (R. 101, Pl.'s Mem. at 20), but he fails to provide evidence demonstrating how these medical conditions substantially limited a major life activity. Defendant, on the other hand, has provided evidence proving that these conditions did not substantially limit Plaintiff in any way. (R. 82-1, Def.'s Mem. at 12-13.) Dr. Osei and Dr. Davidovich, who both treated Plaintiff for his hypertension, testified that Plaintiff's hypertension did not cause him any limitations. (R. 90-1, Ex. MMM, Davidovich Dep. at 23:5-25:1; Pl.'s Rule 56.1 Resp. ¶¶ 67-68.) Dr. Osei, who also treated Plaintiff for his kidney disease, testified that Plaintiff's kidneys were "still doing what [they were] supposed to do," and that his kidney disease was "not that severe" and never limited him in any way. (Pl.'s Rule 56.1 Resp. ¶ 66.) An individual is discriminated against under the ADA if he is subjected to an adverse action because of a perceived physical impairment, regardless of whether that impairment substantially limits, or is perceived to substantially limit, a major life activity. 29 C.F.R. § 1630.2(l)(1). Plaintiff has provided no evidence, however, proving that

Defendant regarded him as being impaired because of his hypertension or his kidney disease, or that Defendant even knew about his hypertension or kidney disease. In fact, Plaintiff denies telling Kubicki he needed a kidney transplant or that he needed time off for his kidney to be tested. (Pl.'s Rule 56.1 Resp. ¶ 65.) Additionally, Triola testified that the only disabilities he knew Plaintiff had were a hernia and vision problems. (R. 97-1, Ex. 10, Triola Dep. at 74:5-7.) Accordingly, the Court finds that unlike Plaintiff's hernia and eye disease, his hypertension and limited kidney disease are not disabilities as defined by the ADA.

### B.      Whether Plaintiff was discriminated against because of his disabilities

Just like for Title VII and ADEA discrimination claims, a plaintiff may prove discrimination in violation of the ADA using either the direct or indirect method. *Timmons v. General Motors Corp.*, 469 F.3d 1122, 1126 (7th Cir. 2006). Under the direct method of proof, a plaintiff can present either direct or circumstantial evidence to meet his burden. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004).

Plaintiff seeks to prove discrimination under the ADA under the direct method of proof through circumstantial evidence. (R. 101, Pl.'s Mem. at 21.) He relies on the same circumstantial evidence he relied on to prove race, national origin, and age discrimination to similarly prove that Defendant discriminated against him based on his disabilities by failing to promote or train him and by terminating his employment. (*Id.*) Plaintiff also provides additional circumstantial evidence of Chavez's statements and actions with regards to his disabilities. Plaintiff alleges that on one occasion, Chavez told him that he was terminated after he had presented a doctor's note to her. (*Id.*) Plaintiff then asked to speak with someone in Human Resources, and Chavez called Kubicki, who told Chavez that she could not terminate Plaintiff. (*Id.*) After hanging up with Kubicki, Chavez burst out of her office yelling expletives and

saying, "I can't believe this . . . I can't get rid of this guy for nothing." (*Id.*) On another occasion, Plaintiff alleges that Chavez told him, "You're sick a lot, I don't think this job is for you," and stated that Plaintiff was too sick to work for Defendant. (*Id.*) Further, Chavez reduced Plaintiff's hours after he informed her of his vision restrictions, which prevented him from driving at night. (*Id.*) All this evidence, taken together with the evidence of pretext Plaintiff provides for his Title VII, Section 1981, and ADEA claims, and viewed in the light most favorable to Plaintiff, would permit a rational fact finder to infer that Defendant discriminated against Plaintiff because of his disabilities. Accordingly, the Court finds that Plaintiff's disability discrimination claim survives summary judgment.

### C. Whether Plaintiff's failure to accommodate claim is properly before the Court

Plaintiff alleges that Defendant failed to reasonably accommodate his lifting restriction and his vision restriction. (R. 101, Pl.'s Mem. at 24.) Defendant argues that Plaintiff failed to adequately allege a failure to accommodate claim in his EEOC Charge and, consequently, the Court should dismiss any failure to accommodate claim Plaintiff now makes. (R. 82-1, Def.'s Mem. at 14.) Plaintiff did fail to allege a failure to accommodate claim in his EEOC Charge. (*See* R. 48-1, Ex. B, EEOC Charge.) Plaintiff nonetheless argues that his failure to accommodate claim is properly before the Court because it is "reasonably related" to the allegations in the EEOC Charge. (R. 101, Pl.'s Mem. at 21-22.) The Seventh Circuit has held that "a plaintiff is barred from raising a claim in the district court that had not been raised in his or her EEOC charge unless the claim is reasonably related to one of the EEOC charges and can be expected to develop from an investigation into the charges actually raised." *Green v. Nat'l Steel Corp., Midwest Div.*, 197 F.3d 894, 898 (7th Cir. 1999). In his EEOC Charge, Plaintiff alleged that he was harassed because of his disability and stated, "I believe that I have been discriminated

against because of my disability and retaliated against for engaging in protected activity in violation of the Americans with Disabilities Act of 1990, as amended." (R. 48-1, Ex. B, EEOC Charge at 1-2.) A discrimination claim is distinct from a failure to accommodate claim under the ADA. *Green*, 197 F.3d at 898. "Therefore, they are not like or reasonably related to one another, and one cannot expect a failure to accommodate claim to develop from an investigation into a claim that an employee was terminated because of a disability." *Id.*; *see Beard v. Don McCue Chevrolet, Inc.*, No. 09 C 4218, 2012 WL 2930121, at *11 (N.D. Ill. July 18, 2012) (finding that plaintiff's failure to accommodate claim was not reasonably related to his discrimination claim); *Kaplan v. New Trier High Sch.*, No. 11 C 981, 2011 WL 2148936, at *3 (N.D. Ill. May 31, 2011) (finding that a plaintiff's failure to accommodate claim was "beyond the scope of the charge of discrimination she filed with the EEOC").

Plaintiff argues that he submitted a copy of the complaint he filed with Defendant's Human Resources Department to the EEOC, and that this internal complaint should supplement the allegations in his EEOC Charge. (R. 101, Pl.'s Mem. at 22.) Written "[a]llegations outside the body of the charge may be considered when it is clear that the charging party intended the agency to investigate the allegations." *Swearnigen-El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 865 (7th Cir. 2010) (quoting *Vela v. Vill. of Sauk Vill.*, 218 F.3d 661, 664 (7th Cir. 2000)). The Court finds that it is clear that in sending the EEOC a copy of his internal complaint, Plaintiff intended the agency to investigate the allegations he made in the internal complaint. Therefore, the Court will consider the internal complaint as part of his EEOC Charge. But in examining the internal complaint, the Court finds that it does not state a charge of failure to accommodate. Plaintiff draws the Court's attention to the part of the internal complaint which states, "against the weight requirements of my current position, I have had to lift garbage cans

that weigh in excess of 100 lbs, as a result of which I have developed [an] inguinal hernia that is bothersome and painful"; he argues that this quoted language makes clear that he intended the EEOC to investigate a failure to accommodate claim. (R. 101, Pl.'s Mem. at 22.) The Court, however, disagrees. To establish a failure to accommodate claim, a plaintiff must show that: (1) he has a disability; (2) the employer was aware of his disability; and (3) the employer failed to reasonably accommodate his disability. *Sears, Roebuck & Co.*, 417 F.3d at 797. Plaintiff did not state in the quoted language or in any other part of the internal complaint that he had a lifting restriction prescribed by his doctor. Nor does he make clear that Defendant was not accommodating his doctor prescribed lifting restriction. Rather Plaintiff simply states that he developed a hernia from lifting heavy garbage cans at work. Accordingly, the Court finds that Plaintiff's failure to accommodate claim must be dismissed.

## III.   Plaintiff's Retaliation Claims (Counts IV, VII, and X)

In Counts IV, VII, and X, Plaintiff alleges that Defendants retaliated against him in violation of Title VII, the ADEA, and the ADA for filing internal complaints and a Charge of Discrimination with the EEOC. (R. 48, Am. Compl. ¶¶ 54, 73, 92.) As with discrimination claims, a plaintiff may establish retaliation claims by way of either the direct or indirect method. *Roney v. Ill. Dep't of Transp.*, 474 F.3d 455, 459 (7th Cir. 2007) (Title VII); *Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 657 (7th Cir. 2012) (ADEA); *Anderson v. The Foster Grp.*, 521 F. Supp. 2d 758, 788 (N.D. Ill. 2007) (ADA).[7] Here, Plaintiff seeks to prove his retaliation claims by way of the direct method. (R. 101, Pl.'s Mem. at 11-12, 16-18.) To prevail using the direct method of proof, Plaintiff must present evidence, direct or circumstantial, showing that:

---

[7] The analysis for retaliation claims is the same under Title VII, the ADEA, and the ADA. *See Roney*, 474 F.3d at 459; *Smith*, 674 F.3d at 657; *Anderson*, 521 F. Supp. 2d at 788. The Court thus cites relevant case law interchangeably.

(1) he engaged in a protected activity; (2) he suffered a materially adverse action by his employer; and (3) a causal connection exists between the two. *Silverman v. Bd. of Educ. of Chi.*, 637 F.3d 729, 740 (7th Cir. 2011).[8]

It is undisputed that Plaintiff engaged in protected activities when he filed internal complaints in late 2009 or early 2010 and his EEOC Charge on March 5, 2010. (R. 101, Pl.'s Mem. at 11; R. 82-1, Def.'s Mem. at 15.) Plaintiff argues that he suffered three adverse employment actions in retaliation for filing these complaints: (1) Defendant failed to cross-train or promote him; (2) Defendant did not increase his salary after his May 2010 evaluation; and (3) Defendant terminated him. (R. 101, Pl.'s Mem. at 11, 14.) Defendant argues that Plaintiff's retaliation claims must fail as a matter of law because he cannot identify a causal link between his internal complaints and EEOC Charge and any adverse employment action. (R. 82-1, Def.'s Mem. at 15.) To establish a causal link, Plaintiff must show that his complaints were the but-for cause of an adverse employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2528 (2013). In other words, to survive summary judgment, Plaintiff needs to provide enough direct or circumstantial evidence to allow a jury to conclude that he suffered an adverse employment action because of his statutorily protected activity. *Hobgood*, 731 F.3d at 643; *Burnell v. Gates Rubber Co.*, 647 F.3d 704, 709 (7th Cir. 2011).

Plaintiff filed his EEOC Charge on March 5, 2010, and he was terminated on March 11, 2011. (R. 82-1, Def.'s Mem. at 15-16.) Defendant argues that the one-year gap between his EEOC Charge and his termination precludes his establishing a causal link between the two. (*Id.*

---

[8] To establish a *prima facie* case of retaliation under the indirect method, Plaintiff must satisfy the first two elements of the direct method and further show that (1) he was meeting the employer's legitimate expectations; and (2) he was treated less favorably than a similarly situated employee who did not engage in statutorily protected activity. *Smith*, 674 F.3d at 657-58; *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 838 (7th Cir. 2009). Plaintiff does not offer any evidence to prove retaliation via the indirect method.

at 16.) In order to establish a causal link and support an inference of retaliatory motive, the termination must have occurred "fairly soon after the employee's protected expression." *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998). One year is too long of an interval to allow an inference of retaliatory motive. *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1010 (7th Cir. 2000). Nevertheless, the fact that a year passed between Plaintiff's protected expression and his termination does not preclude him from proving retaliatory discharge; "instead, it means that the timing of [his] discharge, in itself, does not support an inference of retaliation, and [he] must come forward with other evidence." *Id.*

Plaintiff argues that the evidence he presents to prove that Defendant's reasons for terminating him are pretextual, as outlined in detail above, also supports an inference of retaliation. (R. 101, Pl's Mem. at 17.) The Seventh Circuit has held that evidence demonstrating that an employer's reasons for terminating an employee are pretextual is sufficient to create an inference of retaliatory motive and defeat summary judgment on a retaliatory discharge claim. *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 533-35 (7th Cir. 2003). Plaintiff additionally argues that Triola's regular monitoring of him following the filing of his EEOC Charge raises an inference of retaliation. (*Id.*) Triola edited Plaintiff's performance evaluation in May 2010 and told Chavez to include more details about Plaintiff's performance. (*Id.*) Triola also worked closely with Kubicki and Defendant's outside counsel to prepare documentation on Plaintiff in the months preceding Plaintiff's termination. (*Id.*) Examples of this activity include: (1) on January 3, 2011, Triola asked Kubicki for copies of Plaintiff's recent Development Journal entries; (2) on January 13, 2011, Triola told Kubicki that he and Defendant's counsel were drafting a Development Journal entry "to deal with the attendance issue," and that Defendant's attorney would be interviewing Kubicki and Thanawutthikorn "with the sense 'this won't end

well with Bob' – we want to be prepared"; (3) on January 20, 2011, Triola asked

Thanawutthikorn to send Plaintiff's Development Journal, restaurant schedules, and portions of

the Dear Diary to Defendant's counsel; and (4) on March 8, 2011, in response to Kubicki's

report that there was only one Development Journal entry since the beginning of the year, Triola

responded, "Yah, not good." (*Id.* at 17-18.) Plaintiff argues that Triola's actions "suggest that

Defendant indeed began gathering documentation to justify Plaintiff's termination before the

events in the termination memo allegedly occurred." (*Id.* at 18.) Defendant responds that this

evidence is "nothing more than proof Triola was adequately performing his duties as Human

Resource Director." (R. 102, Def.'s Mem. at 17.)

     In addition to the evidence of Triola's monitoring, Plaintiff also offers evidence that

Chavez told other managers to "document every little thing Plaintiff did wrong" after she found

out about Plaintiff's internal complaints. (R. 101, Pl.'s Mem. at 11.) And after Chavez found

out about Plaintiff's EEOC Charge, Chavez was "freaking out" and "ranting" about it, and said

that Plaintiff "had to go." (*Id.*) Between February and March 2010, Chavez and other managers

made six entries in Plaintiff's Development Journal and seventeen entries in the Oak Park

Restaurant's Dear Diary about Plaintiff's alleged performance problems. (*Id.* at 12.)

     The parties did not provide and this Court was unable to find Seventh Circuit precedent

on the issue of increased monitoring of an employee following the filing of an EEOC Charge. A

court in this District has held, however, that "the pronounced increase in negative reviews and

the careful scrutiny of plaintiff's performance, coupled with testimony suggesting that

management personnel were acutely aware of plaintiff's EEOC charge, is sufficient to establish a

causal link for plaintiff's prima facie case of retaliatory discharge." *Flanagan v. Office of Chief

Judge of Circuit Court of Cook Cnty., Ill.*, No. 06 C 1462, 2007 WL 2875726, at *13 (N.D. Ill.

Sept. 28, 2007) (quoting *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1525 (11th Cir. 1991))

(the intense monitoring of plaintiff's work, which "was clearly abnormal, bespeaks a retaliatory

motive"). Here, as in *Flanagan*, Plaintiff's managers, who were aware of Plaintiff's EEOC

Charge, increased their monitoring of Plaintiff's performance and increased the frequency in

which they documented his alleged deficiencies. According to Arrington, this was all done in an

effort to terminate Plaintiff. Thus, the Court finds that viewed in the light most favorable to

Plaintiff, the evidence he presents is sufficient to establish a causal link between Plaintiff's

internal complaints and EEOC Charge and his termination, and it therefore raises an inference of

retaliatory motive.

Plaintiff also argues that Defendant retaliated against him by denying him a raise after his

May 2010 evaluation and by denying him promotion and cross-training opportunities. (R. 101,

Pl.'s Mem. at 11.) The Seventh Circuit has held that a plaintiff cannot establish a causal

connection where "the allegedly retaliatory conduct was merely the continuation of the conduct

giving rise to the complaints." *McDonnell v. Cisneros*, 84 F.3d 256, 259 (7th Cir. 1996); *see*

*also Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 735 (7th Cir. 2002). There needs to be a

"ratcheting up" of any alleged discriminatory conduct after a plaintiff files his complaints.

*Cisneros*, 84 F.3d at 259. Here, Plaintiff filed his internal complaints and EEOC Charge

precisely because he was not getting promoted or cross-trained and was not receiving a raise, and

he felt this was discriminatory treatment. (R. 101, Pl.'s Mem. at 11.) After he filed his

complaints and EEOC Charge, he continued to be denied a promotion and cross-training

opportunities and he continued to be denied a raise until November 2010. (R. 102, Def.'s Resp.

at 18-19.) Because Plaintiff has not alleged any new or increased discriminatory treatment, and

has only alleged the continuation of the conduct he already complained about, the Court finds no evidence of retaliation.

Accordingly, the Court finds that Plaintiff's retaliation claims based on his termination survive summary judgment, but his retaliation claims based on his continual denial of a raise, promotions, and cross-training opportunities do not survive summary judgment.

## IV. Plaintiff's State Law Retaliatory Discharge Claim (Count VI)

In Count VI, Plaintiff alleges that Defendant terminated him in retaliation for filing a claim for workers' compensation benefits. (R. 48, Am. Compl. ¶¶ 65-67.) In Illinois it is unlawful to terminate an employee in retaliation for exercising his rights under the Illinois Workers' Compensation Act (IWCA). *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 773 (7th Cir. 2012) (citing *Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876, 878-79 (Ill. 1981)). A plaintiff claiming retaliatory discharge for filing a workers' compensation claim must show: (1) that he was employed by the defendant before the injury; (2) that he exercised a right granted by the IWCA; and (3) that the discharge is causally related to the filing of the workers' compensation claim. *Clemons v. Mech. Devices Co.*, 704 N.E.2d 403, 406 (Ill. 1998). Here, the first two elements are not in dispute. (R. 82-1, Def.'s Mem. at 19; R. 101, Pl.'s Mem. at 25.) Plaintiff injured his hip and arm while taking out the garbage at work on December 23, 2010, and Thanawutthikorn filed a workers' compensation claim on behalf of Plaintiff on January 14, 2011. (R. 101, Pl.'s Mem. at 24; Pl.'s Rule 56.1 Resp. ¶ 79.) Thus, the only issue is whether Plaintiff can establish that a causal relationship exists between his exercise of a right granted by the IWCA and his termination.

The Seventh Circuit has held that in deciding motions for summary judgment on Illinois retaliatory discharge claims, federal courts are to follow Illinois law rather than the federal

*McDonnell Douglas* burden-shifting approach in determining whether a plaintiff has met his burden on causation. *Gacek v. Am. Airlines, Inc.*, 614 F.3d 298, 303 (7th Cir. 2010). Accordingly, a plaintiff may not survive summary judgment "merely by proving that the reasons given by [Defendant] for firing him were unworthy of belief," as he would under the *McDonnell Douglas* framework. *Id.* Instead, to establish a causal relationship, a plaintiff "must affirmatively show that the discharge was primarily in retaliation for his exercise of a protected right." *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir. 1994) (citing *Marin v. Am. Meat Packing Co.*, 562 N.E.2d 282, 285 (Ill. App. Ct. 1st Dist. 1990)). To do so, a plaintiff must "proffer sufficient evidence from which a reasonable jury could infer that the employer was improperly motivated." *FedEx Freight*, 674 F.3d at 774 (quoting *Roger*, 21 F.3d at 149); *see Hartlein v. Ill. Power Co.*, 601 N.E.2d 720, 730 (Ill. 1992) ("Concerning the element of causation, the ultimate issue to be decided is the employer's motive in discharging the employee."). Here, Plaintiff argues that the facts suggest that Defendant's motive in terminating Plaintiff was pretextual. (R. 101, Pl.'s Mem. at 25.) A pretext argument alone, however, is not enough to establish the element of causation. *Gacek*, 614 F.3d at 303; *see Robinson v. Stanley*, No. 06 C 5158, 2011 WL 3876903, at *6 (N.D. Ill. Aug. 31, 2011) (granting summary judgment on plaintiff's state law retaliatory discharge claim because plaintiff did not provide any evidence of causation and instead simply argued that defendants' proffered reason for terminating her employment was a pretext for retaliatory discharge). Plaintiff offers no evidence to demonstrate that Defendant's actual motivation for terminating him was his filing of a workers' compensation claim as opposed to Defendant's general discriminatory animus against Plaintiff. Plaintiff's unsupported allegations of pretext, with respect to his termination for filing a workers' compensation claim, are insufficient to survive summary judgment on this specific claim.

Plaintiff further notes that when he returned to work on February 10, 2011, after recovering from his workplace accident, he asked Thanawutthikorn to be paid for the days he missed. (R. 101, Pl.'s Mem. at 25.) He was terminated on March 11, 2011, and Plaintiff argues that this short time frame between his request for compensation and his termination raises an inference of causation. (*Id.*) The Seventh Circuit has identified three ways recognized in Illinois law by which an employee may exercise a right under the IWCA: (1) where an employee files a workers' compensation claim; (2) where an employee is preemptively fired to prevent such a filing; and (3) where an employee merely requests and seeks medical attention. *FedEx Freight*, 674 F.3d at 773 (collecting and analyzing Illinois caselaw). Thus, requesting compensation from an employer for days missed is not a protected right under the IWCA. Plaintiff cannot establish a retaliatory discharge claim based on his request for compensation for the time he missed work due to his injury.

"The causality requirement calls for more than a sequential connection." *Roger*, 21 F.3d at 149; *see also FedEx Freight*, 674 F.3d at 775. Therefore, the short time frame between the filing of Plaintiff's workers' compensation claim and his termination (two months) alone is not enough to infer that Defendant was improperly motivated. Because Plaintiff cannot satisfy the causation element, his state law retaliatory discharge claim cannot survive summary judgment.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (R. 82) is GRANTED in part and DENIED in part. The Court grants summary judgment on Count VI and denies summary judgment on Counts I, II, III, IV, V, VII, VIII, and X. The Court dismisses Count IX. The parties are directed to exhaust all settlement possibilities for the remaining claims prior to the next status hearing, which will be held on January 30, 2014, at 10:00 a.m., to set a firm trial date.

ENTERED:

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: January 15, 2014**